# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
## DIVISION ONE

STEPHEN C. SIMMONS,

        Appellant,

    v.

STATE OF WASHINGTON,

        Respondent.

)
)
)
)
)
)
)
)
)
)
)
)

No. 72836-9-I

UNPUBLISHED OPINION

FILED:  June 1, 2015

VERELLEN, A.C.J. — Stephen Simmons appeals the summary judgment dismissing his disparate treatment claims.  Simmons contends that he was not given regular performance reviews and that an individual supervisor applied a more rigorous pay raise standard to him than to others.  But Simmons does not establish that his lack of regular performance reviews resulted in any adverse employment consequence, he does not establish "comparators" required for a disparate treatment pay raise claim, and he does not rebut the Department of Social and Health Services's (DSHS) legitimate, nondiscriminatory reasons for his pay raises with evidence of pretext.  Under the well-defined standards for employment discrimination claims, Simmons fails to establish a genuine issue of material fact warranting a trial.  We affirm.

## FACTS

Simmons, an African American, works within DSHS's Enterprise Risk Management Office.  He holds a Washington Management Service (WMS) position as a risk management administrator, managing tort lawsuits filed against DSHS.  Each WMS

position has a salary range (a "band"). Simmons's position is in Band 2 with a salary range of $61,200 to $81,600. His current salary is $76,932.

Bernie Friedman supervised Simmons from 2001 to 2006. Friedman did not give Simmons any performance reviews. Simmons received a 5 percent raise in January 2002 and another raise in 2004. The size of the 2004 raise is unclear from the record.

Liz Dunbar supervised Simmons in 2006. Dunbar gave Simmons his first performance review and a "lump sum payment" of $12,000.[1] Simmons could not recall, and the record is unclear, if he also received a raise after his performance review with Dunbar.

Joe Olson supervised Simmons in 2007. Olson did not give Simmons a performance review, and Simmons did not receive a raise.

Kevin Krueger supervised Simmons from April 2008 to October 2010. Krueger gave Simmons a performance review in 2008 and recommended a 3 percent raise for Simmons. Krueger testified that Simmons "was the only one during that period [in 2008] that I was advocating for a salary increase" because other employees, such as Kristal Wiitala and Kevin Doty, had previously received raises.[2] Krueger reviewed Simmons's pay history and learned that he had not had a raise since 2006. Krueger recommended a 3 percent raise that would "bring him up" even with Kristal Wiitala and Kevin Doty.[3] When asked if there was any other reason he did not give Simmons a 5 percent raise, Krueger testified:

---

[1] Clerk's Papers (CP) at 127.

[2] CP at 1000.

[3] CP at 1163.

2

> Because I found his performance, while *it was excellent,* I think he was -- *there wasn't anything extraordinary.* And I looked at the criteria that we went over in the other document, and it looked like he was doing his job. I asked him, "Was there anything extraordinary or different or something unusual that was different?"
>
> . . . .
>
> I was looking for Steven [sic] to help me answer that question, what it was, if there was some unique case or anything, and he wouldn't provide me the information.[4]

Simmons rejected the raise and refused to sign the performance review form. Krueger did not process the raise. Krueger has not been able to locate a copy of the 2008 performance review. The trial court determined it would "draw an adverse inference" against DSHS for not producing Simmons's 2008 performance evaluation.[5] To the extent the trial court was prepared to draw an adverse inference from the missing document, we draw the "adverse inference" that Simmons's 2008 performance review was positive.

In October 2010, DSHS implemented the 3 percent raise retroactive to 2008.

Regulations and administrative policies provide for regular performance reviews of DSHS permanent employees. But performance reviews do "not always happen[,] for a variety of reasons."[6] Krueger did not give Simmons a performance review in 2009 or 2010. Some, but not all, of the Enterprise Risk Management Office's employees received regular performance reviews.

A salary freeze on WMS employees prohibited Krueger from recommending a raise for any WMS employee reporting to him from November 2008 to June 2013

---

[4] CP at 104 (emphasis added).

[5] CP at 779.

[6] CP at 19.

3

except for Simmons, who received 3 percent in 2008, and Sherri Jenkins, who received 5 percent in 2013. Jenkins's 5 percent raise in 2013 was due to her increased job duties and a redesignation to Band 2. Nadine Selene-Hait received a 7.5 percent retention raise, over Krueger's objection, in 2011.

Simmons contends that several DSHS employees are comparators.

Stephen Dotson, a licensed attorney, worked as Discovery Manager. He negotiated his starting salary at $78,000, at the top of the Band 2 range, based upon his prior litigation and public disclosure experience. Wiitala gave Dotson a performance review in 2009, and Krueger gave him performance reviews in 2010 and 2011.

Kevin Doty is the Internal Control and Insurance Manager, a Band 2 position. Doty received four performance reviews.

Mark Greene worked as the Safety and Claims Program Manager. Greene negotiated his starting salary of $78,000, at the top of the Band 2 range. He "was very highly regarded," "had a strong background in safety," and "interviewed extremely well."[7] Greene did not receive a performance review because he was hired in 2008 and retired in 2009.

Sherri Jenkins is the Public Disclosure Manager. She received a 5 percent raise in May 2013 when DSHS redesignated her position to Band 2.

Nadine Selene-Hait is the Operations Manager, a Band 2 position. Krueger gave her three performance reviews. She received a 7.5 percent retention raise in 2011.

Kristal Wiitala, a licensed attorney, is the Public Records/Privacy Officer. DSHS redesignated her position to Band 3 in 2004. She received 5 percent raises and

---

[7] CP at 27.

4

apparently received performance reviews in 2002, 2004, and 2006 (pre-Krueger). Krueger apparently gave her two performance reviews sometime after 2007.

Simmons filed an internal racial discrimination complaint against DSHS and Kevin Krueger. DSHS investigated Simmons's allegations, but did not find any violation of DSHS's nondiscrimination policies. DSHS later assigned Tracy Guerin to supervise Simmons. Guerin gave Simmons an excellent rating in a 2012 performance review.

Simmons sued DSHS for employment discrimination. He asserted multiple racial discrimination claims under chapter 49.60 RCW. The superior court granted DSHS partial summary judgment. Per Simmons's request, the superior court nonsuited the only claim remaining after granting DSHS partial summary judgment.

Simmons appeals.

## ANALYSIS

We review a partial summary judgment order de novo, viewing the facts and all reasonable inferences in the light most favorable to the nonmoving party.[8] Summary judgment is proper if no genuine issues of material fact exist.[9] "A material fact is one that affects the outcome of the litigation."[10] "We may affirm the superior court's summary judgment decision on any ground supported by the record."[11]

---

[8] Fulton v. State, Dep't of Soc. & Health Servs., 169 Wn. App. 137, 147, 279 P.3d 500 (2012).

[9] CR 56(c); Lowman v. Wilbur, 178 Wn.2d 165, 168-69, 309 P.3d 387 (2013) (quoting Michak v. Transnation Title Ins. Co., 148 Wn.2d 788, 794-95, 64 P.3d 22 (2003)).

[10] Owen v. Burlington N. & Santa Fe R.R. Co., 153 Wn.2d 780, 789, 108 P.3d 1220 (2005).

[11] Pacific Marine Ins. Co. v. State, Dep't of Revenue, 181 Wn. App. 730, 737, 329 P.3d 101 (2014).

RCW 49.60.180 prohibits employment discrimination based on race. An employer may not "discriminate against any person in compensation or in other terms or conditions of employment" based on a protected trait, such as race.[12] At trial, the employee "must ultimately prove that [the protected trait] was a 'substantial factor' in an employer's adverse employment action."[13] A "substantial factor" means that the protected trait "was a significant motivating factor bringing about the employer's decision," not that the protected trait was the only factor in the decision.[14]

"[S]ummary judgment to an employer is seldom appropriate" in employment discrimination cases.[15] To overcome summary judgment, a plaintiff need only show "that a reasonable jury could find that the plaintiff's protected trait was a substantial factor motivating the employer's adverse actions."[16] "This is a burden of production, not persuasion, and may be proved through direct or circumstantial evidence."[17]

We apply the McDonnell Douglas Corp. v. Green[18] burden shifting framework to employment discrimination cases based on circumstantial evidence.[19] Because Washington discrimination laws substantially parallel Title VII of the Civil Rights Act of 1964, we may look to federal law for guidance.[20] Under the McDonnell Douglas

---

[12] RCW 49.60.180(3).

[13] Scrivener v. Clark Coll., 181 Wn.2d 439, 444, 334 P.3d 541 (2014).

[14] Id.

[15] Id. at 445.

[16] Id.

[17] Riehl v. Foodmaker, Inc., 152 Wn.2d 138, 149, 94 P.3d 930 (2004).

[18] 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973).

[19] Hill v. BCTI Income Fund–I, 144 Wn.2d 172, 180, 23 P.3d 440 (2001), overruled on other grounds by McClarty v. Totem Elec., 157 Wn.2d 214, 137 P.3d 844 (2006).

framework, the burden of persuasion, at all times, remains with the employee; only the burden of production shifts.[21]

The employee must first establish a prima facie case of discrimination.[22] The "prima facie burden is 'not onerous.'"[23] A minimal evidentiary showing is enough and "'does not even need to rise to the level of a preponderance of the evidence.'"[24] But the employee "must do more than express an opinion or make conclusory statements."[25] The employee must establish "specific and material facts to support each element of his or her prima facie case."[26] If the employee fails to establish a prima facie case, the employer is entitled to summary judgment.

Once the employee establishes a prima facie case, the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for the alleged adverse employment action.[27] If the employer provides a legitimate, nondiscriminatory reason, the burden shifts back to the employee to produce evidence that the employer's

---

[20] Kumar v. Gate Gourmet Inc., 180 Wn.2d 481, 490, 325 P.3d 193 (2014).

[21] Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142, 120 S. Ct. 2097, 147 L. Ed. 2d 105 (2000).

[22] Hill, 144 Wn.2d at 181.

[23] Fulton, 169 Wn. App. at 152 (quoting Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981)).

[24] Id. (quoting Wallis v. J.R. Simplot Co., 26 F.3d 885, 889 (9th Cir.1994)).

[25] Hiatt v. Walker Chevrolet Co., 120 Wn.2d 57, 66, 837 P.2d 618 (1992).

[26] Id. (emphasis omitted).

[27] Hill, 144 Wn.2d at 181.

articulated reason for the employment action was a pretext.[28] But if the employee fails to meet this burden, the employer is entitled to summary judgment.[29]

"Evidence is sufficient to overcome summary judgment if it creates a genuine issue of material fact that the employer's articulated reason was a pretext for a discriminatory purpose."[30] "An employee may satisfy the pretext prong by offering sufficient evidence to create a genuine issue of material fact either (1) that the [employer's] reason is pretextual or (2) that although the employer's stated reason is legitimate, discrimination nevertheless was a substantial factor motivating the employer."[31]

"An employee does not need to disprove each of the employer's articulated reasons to satisfy the pretext burden of production."[32] "[I]t is the plaintiff's burden at trial to prove that discrimination was a substantial factor in an adverse employment action, not the only motivating factor."[33] "An employer may be motivated by multiple purposes, both legitimate and illegitimate, when making employment decisions and still be liable" under chapter 49.60 RCW.[34]

---

[28] Id. at 182.

[29] Johnson v. Dep't of Soc. And Health Servs., 80 Wn. App. 212, 227, 907 P.2d 1223 (1996).

[30] Scrivener, 181 Wn.2d at 446.

[31] Id. at 446-47.

[32] Id. at 447 (emphasis omitted).

[33] Id.

[34] Id.

"If the [employee] satisfies the McDonnell Douglas burden of production requirements, the case proceeds to trial, unless the judge determines that no rational fact finder could conclude that the action was discriminatory."[35]

*Performance Reviews*

Simmons first contends summary judgment was improper because he established a prima facie claim of disparate treatment. Specifically, he contends DSHS treated him differently than similarly situated employees because he received fewer performance reviews. But Simmons did not suffer an adverse employment action amounting to a "tangible impact" on his workload or pay.

To establish a prima facie case of racial discrimination based on disparate treatment, the employee must show his employer treats some people less favorably than others based on their race.[36] The primary inquiry is whether the employee's circumstantial evidence is sufficient to create an inference that the employer's decision was based on race.[37] In other words, liability depends on whether the protected trait motivated the employer's decision. And that decision must result in an adverse employment action  The employee must show that (1) he belongs to a protected class, (2) he and the nonprotected, similarly situated employee, or comparator, did substantially the same work, (3) he was treated less favorably in his employment than a comparator, and (4) he suffered an adverse employment action.[38]

_____

[35] Id. at 446.

[36] Domingo v. Boeing Emps. Credit Union, 124 Wn. App. 71, 81, 98 P.3d 1222 (2004); Johnson, 80 Wn. App. at 227.

[37] LINDEMANN, BARBARA T., GROSSMAN, PAUL & WEIRICH, C. GEOFFREY, EMPLOYMENT DISCRIMINATION LAW, at 2-24 to -25 (5th ed. 2012).

[38] Domingo, 124 Wn. App. at 81.

The elements of a prima facie case are not absolute but vary based on the relevant facts.[39] "Some courts treat the requirement that the job action be adverse as part of the prima facie case."[40] We agree.

The parties here do not dispute the first two prongs. Simmons is a member of a protected class.[41] DSHS concedes that Simmons's colleagues—Dotson, Doty, Greene, Jenkins, Selene-Hait, and Wiitala—"were similarly situated to Mr. Simmons" only for performance reviews.[42]

For the third prong, Simmons received fewer performance reviews than others. Dotson (3), Doty (4), Selene-Hait (3), and Wiitala (5) all received more performance reviews than Simmons.[43] But a disparate-treatment claim also requires "'an actual adverse employment action, such as a demotion or adverse transfer.'"[44]

"Not every employment decision amounts to an adverse employment action," even decisions that negatively impact an employee.[45] An adverse employment action is generally limited to tangible employment actions that constitute a "significant change in

---

[39] Burdine, 450 U.S. at 253; McDonnell Douglas, 411 U.S. at 802; Grimwood v. Univ. of Puget Sound, Inc., 110 Wn.2d 355, 363, 753 P.2d 517 (1988).

[40] LINDEMANN, supra, at 2-21 to -22.

[41] CP at 8; McDaniels v. Grp. Health Coop., No. C13-1689JLR, 2014 WL 5471991, at *8 (W.D. Wash. 2014); Domingo, 124 Wn. App. at 81.

[42] Respondent's Br. at 2.

[43] While Greene received fewer performance reviews than Simmons, he only worked one year for DSHS and then retired. The record is unclear how many performance reviews Jenkins received.

[44] Kirby v. City of Tacoma, 124 Wn. App. 454, 465, 98 P.3d 827 (2004) (quoting Robel v. Roundup Corp., 148 Wn.2d 35, 74 n.24, 59 P.3d 611 (2002)).

[45] Strother v. S. Cal. Permanente Med. Grp., 79 F.3d 859, 869 (9th Cir. 1996); Huddleston v. Sunshine Mills, Inc., 965 F. Supp. 2d 1298, 1312 (N.D. Ala. 2013).

employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits."[46] An adverse employment action "must involve a change in employment conditions that is more than an 'inconvenience or alteration of job responsibilities'"[47] and must produce "'a material employment disadvantage.'"[48]

No evidence suggests Simmons suffered any harm from DSHS's failure to provide him as many performance reviews as his comparators. Apart from a 3 percent temporary salary reduction for all DSHS employees, Simmons's salary was never reduced, he was never demoted or adversely transferred, his employment conditions or privileges never changed, and he was not denied a position within or outside DSHS.

Simmons claims the lack of regular performance reviews constitutes an adverse employment action because it led to reduced career growth and an inferior salary. The record here does not support his contention. Simmons's declaration is limited to generalities about his comparators obtaining promotions because of regular performance reviews.[49] But these generalities do not support a reasonable inference

---

[46] Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 761, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998).

[47] Kirby, 124 Wn. App. at 465 (quoting DeGuiseppe v. Vill. of Bellwood, 68 F.3d 187, 192 (7th Cir. 1995)); see also Alonso v. Qwest Commc'ns Co., LLC, 178 Wn. App. 734, 746, 315 P.3d 610 (2013) (an adverse employment action must involve "a change in employment conditions," such as "reducing an employee's workload and pay").

[48] Higgins v. Gonzalez, 481 F.3d 578, 584 (8th Cir. 2007) (quoting Kerns v. Capital Graphics, Inc., 178 F.3d 1011, 1016-17 (8th Cir. 1999)), abrogated on other grounds by Torgeson v. City of Rochester, 643 F.3d 1031 (8th Cir. 2011).

[49] See, e.g., CP at 127 ("These performance reviews and development plans are precursors to advancement and pay raises."); CP at 131 ("Krueger's retaliation and withholding the original 2008 raise until October 12, 2010 is also actionable and compensable in the form of lost opportunity costs and interest on the withheld salary."); CP at 139 ("The absence of the regular reviews and performance plans curtailed my

that the lack of regular performance reviews impacted his opportunities for career growth.

Simmons relies upon Kirby v. City of Tacoma, which held that the employer's failure to promote the employee to captain had a "tangible impact" on the employee's "workload or pay" because the employee had actually applied for that position.[50] But unlike in Kirby, Simmons provides no evidence that his lack of regular performance reviews caused a tangible impact on his career growth. His claims of a hypothetical impact on opportunities for career growth are inadequate.

Simmons also claims the lack of regular performance reviews negatively impacted his raises, but the record does not support a correlation between performance reviews and raises. For example, Selene-Hait received a 7.5 percent retention raise in 2011, and Jenkins received a 5 percent raise in 2013. But no evidence suggests these raises were attributed to more performance reviews. Dotson and Selene-Hait received job offers from other government departments. But no evidence suggests the number of performance reviews in their files contributed to the job offers. Further, Doty's performance reviews occurred after his raise in 2007. While Dotson received three performance reviews, he never received a raise. Because neither Simmons nor any other WMS employee could receive a raise from November 2008 to June 2013 for "growth and development," Simmons could not have been denied a raise during that time period for missed performance reviews.

---

ability to ascend in the agency in the future."); CP at 141 ("Within DSHS, "excellent" non-minority employees that are provided performance reviews flourish.").

[50] 124 Wn. App. 454, 465, 98 P.3d 827 (2004).

In sum, on this record, receiving fewer performance reviews did not constitute a "significant change in employment status"[51] or a "change in employment conditions."[52] Simmons has not shown the lack of regular performance reviews led to a change in employment conditions or status.[53] The failure to issue as many performance reviews as his comparators does not by itself constitute an adverse employment action. Simmons's alleged adverse impacts rest on speculation and conjecture. Therefore, we conclude Simmons fails to demonstrate a prima facie case of racial discrimination based on a lack of regular performance reviews.

### Krueger's Pay Raise Standard

Simmons's disparate treatment pay raise claim is narrowly focused upon the standard applied by one supervisor, Kevin Krueger. But Simmons does not satisfy the prima facie requirements for that claim.

Simmons's disparate treatment claim based on Krueger's pay raise standard is also subject to the McDonnell Douglas burden-shifting analysis. To establish a prima facie case of racial discrimination based on disparate treatment, the employee must show that (1) he belongs to a protected class, (2) that he and the nonprotected, similarly situated employee, or comparator, did substantially the same work, (3) he was treated

---

[51] Brooks v. Firestone Polymers, LLC, 2014 WL 5088657, at *9.

[52] Alonso, 178 Wn. App. at 746.

[53] See Higgins, 481 F.3d at 486-87 (determining that the failure to give timely performance reviews was not an adverse employment action); Wojciechowski v. Nat'l Oilwell Varco, L.P., 763 F. Supp. 2d 832, 857 (S.D. Tex. 2011) ("[The] failure to grant [the employee's] request for a performance review, in and of itself, does not constitute an 'adverse employment action . . . .'").

less favorably in his employment than a comparator, and (4) he suffered an adverse employment action.[54]

The critical question is what comparators Simmons must establish for a prima facie case. Simmons argues his disparate treatment pay raise claim requires comparators that have only some rational relationship to the discriminatory conduct at issue. But in a pay raise setting, the "'similarly situated'" analysis is stringent.[55] The "comparator must be nearly identical" to the employee in all relevant and material respects.[56]

To determine whether employees are directly comparable, we may look to all relevant factors, including whether the employees held the same job description, were subject to the same standards, were subordinate to the same supervisor, and had comparable experience, education, and other qualifications.[57] Enough common factors must exist "to allow for a meaningful comparison" to determine "whether intentional

---

[54] Domingo, 124 Wn. App. at 81.

[55] Moran v. Selig, 447 F.3d 748, 755 (9th Cir. 2006) (holding that the employee in the protected class must be "similarly-situated in all material respects" to the employees who are allegedly treated more favorably) (quoting McGuinness v. Lincoln Hall, 263 F.3d 49, 53-54 (2d Cir. 2001)); Pierce v. Commonwealth Life Ins. Co., 40 F.3d 796, 802 (6th Cir. 1994) (holding that the employee in the protected class must be similarly situated "in all relevant aspects" and "nearly identical" to the employees who are allegedly treated more favorably).

[56] Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1091 (11th Cir. 2004); Ajayi v. Aramark Bus. Servs., Inc., 336 F.3d 520, 531-32 (7th Cir. 2003); see also Coleman v. Donahoe, 667 F.3d 835, 846 (7th Cir. 2012) ("Similarly situated employees 'must be directly comparable to the [employee] in all material respects,' but they need not be identical in every conceivable way." (internal quotation marks omitted) (quoting Patterson v. Indiana Newspapers, Inc., 589 F.3d 357, 365-66 (7th Cir. 2009))).

[57] Ajayi, 336 F.3d at 532.

discrimination was at play."[58]  If the employee fails to establish a prima facie case, summary judgment is proper.

Krueger supervised Simmons from April 2008 to October 2010.  Of course, Simmons may use any conduct occurring before April 2008 or after October 2010 as circumstantial evidence to prove a discriminatory motive.  But any actionable disparate treatment based on Krueger's pay raise standard necessarily turns on Krueger's actions while supervising Simmons.

Simmons fails to establish that he and his purported comparators were similarly situated in all relevant and material respects.  The superior court concluded Simmons "has not presented a material question of fact" whether Jenkins and Selene-Hait are valid comparators.[59]  There was "no side-by-side comparison of these employees' job duties, skills, or education in a meaningful way."[60]  The record here lacks any evidence that Jenkins and Selene-Hait had the same job description, had comparable experience, education, and other qualifications as Simmons, and performed substantially the same work as Simmons.  Additionally, Jenkins and Selene-Hait were not subordinate to the same supervisor.  For example, from April 2008 to October 2010, Simmons reported to Krueger and was the only WMS employee whom Krueger recommended for a raise.  When Jenkins and Selene-Hait received raises, Simmons no longer reported to Krueger.  In light of the record's scant information about his purported comparators, Simmons fails to offer evidence sufficient to create a genuine issue of

---

[58] Coleman, 667 F.3d at 847.

[59] RP (Nov. 15, 2013) at 73.  Dotson, Green, Doty, and Wiitala did not receive any pay raises during or after the relevant period and thus are not valid comparators for Simmons's disparate treatment pay raise standard claim.

[60] RP (Nov. 15, 2013) at 72.

material fact that he was similarly situated to and did substantially the same work as Jenkins and Selene-Hait. Therefore, Simmons fails to demonstrate a prima facie case of racial discrimination based on Krueger's pay raise standard.

But even if Simmons established a prima facie case of racial discrimination, his disparate treatment claim would still fail because DSHS has articulated legitimate, nondiscriminatory reasons for Simmons's pay raises from April 2008 to October 2010, and Simmons has not presented evidence that these reasons were a pretext for discrimination.

The employer must "articulate its nondiscriminatory reason for the challenged action with some specificity in order to afford the [employee] 'a full and fair opportunity to demonstrate pretext.'"[61] To show pretext using circumstantial evidence, an employee must put forward specific and substantial evidence challenging the credibility of the employer's motives.[62] "[P]retext may be demonstrated by direct or indirect evidence, including evidence presented as part of the prima facie case."[63] The employee must show that the employer's articulated reasons "(1) had no basis in fact, (2) were not really motivating factors for its decision, (3) were not temporally connected to the adverse employment action, or (4) were not motivating factors in employment decisions for other employees in the same circumstances."[64] In other words, the employee must

---

[61] LINDEMANN, supra, at 2-35 (quoting Burdine, 450 U.S. at 255-56); Hill, 144 Wn.2d at 181.

[62] Vasquez, 349 F.3d at 642.

[63] Johnson, 80 Wn. App. at 229.

[64] Fulton, 169 Wn. App. at 161.

provide enough evidence for a reasonable fact finder to conclude the employer undertook the challenged employment action because of the employee's race.[65]

A trial court may still grant summary judgment even though the employee establishes a prima facie case and presents some evidence to challenge the employer's reasons for its action.[66] When the record "'conclusively reveal[s] some other, nondiscriminatory reason for the employer's decision, or if the [employee] created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred,'" summary judgment is proper.[67]

Simmons fails to demonstrate that Krueger applied a disparate treatment pay raise standard to his detriment. In the two-and-a-half years that Krueger supervised Simmons, Krueger recommended a raise only for Simmons. With limited exception, a salary freeze prevented any WMS employees from receiving raises. Simmons focuses on Krueger's deposition testimony that he did not give Simmons a 5 percent raise in 2008 because, although his performance was "excellent," "there wasn't anything extraordinary" about his work.[68] Krueger also testified that he gave Jenkins a 5 percent raise for "excellent" but not extraordinary work in 2013.[69] But Simmons ignores the context of these raises.

---

[65] McDaniels, 2014 WL 5471991, at *7.

[66] Milligan v. Thompson, 110 Wn. App. 628, 637, 42 P.3d 418 (2002).

[67] Fulton, 169 Wn. App. at 161-62 (first alteration in original) (emphasis omitted) (quoting Hill, 144 Wn.2d at 184-85).

[68] CP at 104.

[69] CP at 105.

The record here conclusively reveals that DSHS proffered legitimate, nondiscriminatory reasons for Simmons's raises. At best, Simmons raises a "'weak issue of fact.'"[70] For example, Krueger testified that the recommended 3 percent raise in 2008 would "bring him up" to Wiitala and Doty, to whom Krueger did not give a raise in 2008.[71] After Simmons left Krueger's supervision, only two WMS employees received raises: Jenkins and Selene-Hait. Krueger objected to Selene-Hait's 7.5 percent retention raise in 2011. Jenkins received a 5 percent raise in 2013 because she had increased job duties and because DSHS redesignated her position to Band 2. Krueger never recommended raises for Green or Dotson because they negotiated their salary to the top of their pay bands. Further, Krueger did not supervise Doty when he received his 5 percent raise in 2007, and Krueger never gave Wiitala a raise.

In sum, the record demonstrates that Simmons has received the most raises since 2001. Simmons received a 5 percent raise in 2002, a raise in 2004, a $12,000 lump sum payment in 2006, and a 3 percent raise in 2008, implemented in 2010 retroactive to 2008. Importantly, from April 2008 to October 2010, while Krueger supervised Simmons, the only employee who received a raise was Simmons. Simmons has not rebutted DSHS's explanations with any evidence that Krueger's failure to give Simmons more or greater raises from April 2008 to October 2008 was a pretext for discrimination Therefore, Simmons fails to establish a prima facie case of racial discrimination based on Krueger's pay raise standard.

---

[70] Id.

[71] CP at 1163.

Finally, Simmons raises for the first time on appeal an equal protection claim. With minimal authority, he generally contends that treating an individual different than others with or without racial discrimination violates equal protection. But he provides no compelling authority for this vague proposition. Because we consider only "'issues called to the attention of the trial court'" when "reviewing an order granting or denying summary judgment," we reject his contention.[72]

## CONCLUSION

Simmons fails to establish a genuine issue of material fact for his disparate-treatment claims. We therefore conclude the trial court properly granted DSHS summary judgment.

We affirm.

WE CONCUR:

---

[72] Bankston v. Pierce County, 174 Wn. App. 932, 941, 301 P.3d 495 (2013) (quoting RAP 9.12).