# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| BATTLE GROUND CINEMA, LLC., a Washington limited liability company, | No. 47718-1-II |
| Appellant, | |
| v. | |
| ROBERT BERNHARDT and KAREN BERNHARDT, a married couple; CHARLES MULLIGAN, an individual; SAMUEL WALKER and SHELLEY WALKER, as Trustees of the WALKER FAMILY TRUST, a California trust; CHRISTOPER WALKER, and LARA EVAN-WALKER, a married couple; and SAMUEL WALKER, as Trustee of the JTW TRUST, a California Trust, | |
| Respondents. | UNPUBLISHED OPINION |
| SAMUEL WALKER and SHELLEY WALKER, as Trustees of the WALKER FAMILY TRUST, a California trust; CHRISTOPER WALKER, and LARA EVAN-WALKER, a married couple; and JOSEPH WALKER, as Trustee of the JTW TRUST, a California Trust; ROBERT and KAREN BERNHARDT, a married couple; and CHARLES MULLIGAN, an individual, | |
| Respondents, | |
| ELIE G. KASSAB, an individual; THE GARDNER CENTER, LLC, a Washington limited liability company; and BATTLE GROUND CINEMA, LLC, a Washington limited liability company, | |
| Appellants. | |

No. 47718-1-II

LEE, J. — Battle Ground Cinema LLC (the Cinema) and its owner, Elie Kassab, appeal the superior court's rulings in a consolidated case that was dismissed on summary judgment. The Cinema argues that the superior court erred in granting summary judgment in favor of the landlord, Samuel Walker et al[1] (collectively, "the Walker Ownership"), in a breach of lease case where the Cinema alleged the landlord breached its duty to maintain the common areas of the shopping center. Kassab separately appeals the superior court's award of attorney fees, costs, expenses, and disbursements on the consolidated case, and the superior court's alternative award against Kassab under RCW 4.84.185. Kassab further requests we hold that an order by the discovery master below is moot or no longer in effect. Finally, all parties request attorney fees for this appeal.

We reverse the superior court's order granting summary judgment to the Walker Ownership. We also reverse the award of attorney fees and costs to the Walker Ownership. This decision does not affect the prevailing party from seeking a determination of reasonable fees and costs at the conclusion of the case in superior court. Further, the discovery master's order is moot because it was issued for the purpose of discovering information that is no longer relevant.

---

[1] The parties identified as the landlord include Samuel Walker and Shelley Walker, as trustees of the Walker Family Trust; Samuel Walker, as trustee of the JTW Trust; Christopher Walker; Laura Evans-Walker; Robert Bernhardt; Karen Bernhardt; and Charles Mulligan.

FACTS

A.    BACKGROUND

Kassab started two companies, the Cinema and The Gardner Center LLC.  Through The Gardner Center LLC, and other entities Kassab owned, Kassab built a shopping center called the Gardner Center.  The Gardner Center included a movie theatre space, which the Cinema leased from The Gardner Center LLC.  The Cinema and The Gardner Center LLC signed a lease in July 2004.  Attached at the end of the lease was a rider that contained a personal guaranty by Kassab for the Cinema's obligations under the lease.  The Cinema was considered the Gardner Center's anchor tenant.

In 2006, the Walker Ownership purchased the Gardner Center from The Gardner Center LLC.  As part of that sale, The Gardner Center LLC assigned its lease with the Cinema to the Walker Ownership.

By 2011, the Cinema was struggling financially.  Kassab and the Walker Ownership negotiated the potential for temporary rent reductions to be paid back in subsequent months after a restaurant was opened.

In May 2012, the Cinema was still struggling financially.  Kassab requested further rent reductions.  At this time, Kassab also raised concerns about the management and maintenance of the Gardner Center.

Specifically, Kassab complained about the pests and other problems in the shared garbage disposal area.  Also, curbs and sidewalks were cracked and hazardous, and a water feature that had overflowed was in disrepair.  By mid July 2012, multiple e-mails were exchanged between Kassab and the Walker Ownership regarding the maintenance of the Gardner Center.

In August, "National Property Inspections" conducted an inspection of the Gardner Center around the movie theatre. The inspection identified numerous points on the property for which it "[r]ecommend[ed] repair" or cleaning. *See e.g.*, Clerk's Papers (CP) at 4179. Such points included cracks in the parking lot, an unfinished ramp near the water feature, an "undermined" sidewalk that "is causing a tripping hazard," indications of the water feature's overflow, cracks in the water feature's mortar joints, weed overgrowth, and uncleanliness of the garbage disposal area. CP at 4180.

In September, Kassab's attorney sent the Walker Ownership a letter stating that the Cinema would terminate its lease with the Gardner Center at the end of the month. The letter cited the continuing garbage disposal issues and several of the other issues identified in the inspection report. The Walker Ownership responded that pursuant to the personal guaranty that Kassab had signed and attached as a rider to the lease, Kassab was responsible for paying the full term of the lease, which expires on April 30, 2030. Kassab did not terminate the lease.

E-mail correspondence regarding the various maintenance problems at the Gardner Center continued after Kassab's threatened termination. Kassab continued to complain of continuing maintenance problems, and the Walker Ownership continued to claim the issues were being, or would be, addressed.

In October, Kassab's attorneys forwarded a memo to the Walker Ownership that contained a copy of the lease, but which included a third page to the personal guaranty. This third page of the guaranty purported to limit the guaranty to only 10 years, amending the guaranty contained in the first two pages, which guaranteed the lease for 25 years.

B.      THE CINEMA FILES SUIT

On December 3, 2012, the Cinema sued the Walker Ownership for failing to maintain the common areas of the Gardner Center in Clark County Superior Court case number 12-2-04501-5 (Lease Case).  The second amended complaint alleged two causes of action: first, the failure to fulfill the maintenance obligations; and second, the Walker Ownership had overcharged the Cinema for its pro rata share of the common area maintenance assessment.  The Cinema claimed damages in decreased business activity and overcharges.

The Walker Ownership's answer asserted affirmative defenses and counterclaims.  The Walker Ownership asserted that the lease did not require the Walker Ownership to perform the common area maintenance the Cinema alleged had not been performed.  The Walker Ownership counterclaimed, alleging that the Cinema had breached the lease by failing to pay interest and late charges and that Kassab had breached the guaranty by asserting the guaranty on the lease was only for ten years.  On these counterclaims, the Walker Ownership claimed damages of at least $18,200.08.

C.      THE WALKER OWNERSHIP FILES SUIT

On December 17, 2012, the Walker Ownership sued Kassab, The Gardner Center LLC, and the Cinema for breach of contract,[2] declaratory judgment, and two allegations each of fraud and intentional misrepresentation, fraudulent omissions, fraudulent inducement, and negligent misrepresentation (Guaranty Case).  The Walker Ownership asserted that the purported third page

---

[2] The complaint alleged that denying the guaranty was for 25 years was a breach of contract.  The complaint further alleged that if the court found that the guaranty was for 10 years, then Kassab's failure to disclose the 10-year guaranty was a breach of contract.

of the guaranty was a forgery, or, if it was not a forgery, that Kassab failed to deliver or disclose the third page of the guaranty during the due diligence period of the Walker Ownership's purchase of the Gardner Center.

D.    SUIT CONSOLIDATION

In August 2014, Kassab moved to consolidate the Lease Case and the Guaranty Case. In September, the superior court granted Kassab's motion to consolidate the Lease Case and the Guaranty Case.

E.    DISCOVERY

The parties engaged in substantial and contentious discovery. A discovery master was appointed pursuant to CR 53.3. The Walker Ownership filed a motion for an in-camera review of communications between Kassab and his former attorneys to search for evidence of fraud. The discovery master granted the motion and ordered the in-camera review because the Walker Ownership had made a "very strong showing of fraud" by Kassab. CP at 7906. The in-camera review was postponed, however, pending the outcome of the parties' competing summary judgment motions, discussed in section G below.

F.    DOCUMENTS RELEVANT TO THE DISPUTE

1.    The Lease

Relevant to this case are sections 1.1, 3.2, 6.5, 16.7, and paragraph 13 of "Exhibit E" to the lease. The sections, or the relevant portions of them, state:

a. Section 1.1

In pertinent part, section 1.1 states, "The Lease is subject to all easements, restrictions, [and] agreements of record." CP at 3056.

b. Section 3.2

Section 3.2 of the lease is a subsection of the "Rent" section of the lease and is titled

"Additional Rent."  CP at 3058.  Section 3.2 provides:

> (1)    Operating Expenses. In addition to the minimum monthly rent, Tenant shall pay as additional rent its share of all operating expenses for the Retail Center.  As used herein *"operating expenses" shall mean all costs of administration, operation, management, maintenance, repair and replacement of the common areas of the Retail Center . . . including but not limited to: . . . costs of repairs, replacements and general maintenance*; cost or rental value of the Retail Center office; and a management fee of four percent (4 %) of the gross rentals of the Retail Center.

CP at 3058 (emphasis added).

c. Section 6.5

Section 6.5 of the lease is a subsection of section 6, which addresses "Insurance and

Indemnity" under the lease.  CP at 3060.  Section 6.5 is the indemnity clause and states:

> Indemnity of Landlord.  Tenant hereby waives all claims against Landlord for damage to any property or injury, illness or death of any person in, upon, or about the Premises and/or Retail Center arising at any time and from any cause whatsoever.  Tenant shall defend, indemnify and hold harmless Landlord, its managers and members and any managing agent or other designee for, from and against any and all claims, liabilities, costs and expenses for any damage to any property or injury, illness, or death of any person arising out of the use or occupancy of the Premises or occurring outside the Premises in the Retail Center where such damage, injury, illness, or death shall be caused in whole or in part by the act or failure to act of Tenant, its agents, servants, employees, invitees, contractors or licensees.

CP at 3061.

d. Section 16.7

Section 16.7 of the lease falls under the "Miscellaneous" heading and provides:

> Attorneys' Fees.  In the event suit or action is instituted to interpret or enforce the terms of this Lease, the prevailing party shall be entitled to recover from the other

party such sum as the court may adjudge reasonable as attorneys' fees at trial, on petition for review, or on appeal, in addition to all other sums provided by law.

CP at 3067.

e. Paragraph 13 of Exhibit E

Paragraph 13 of Exhibit E to the lease, which provides the "Retail Center Rules and Regulations," states: "Areas Outside of Premises. Tenant shall keep the outside areas immediately adjoining the Premises clean and free from snow, ice, dirt and rubbish, and shall not place or permit any obstructions or merchandise in any of such areas." CP at 3086-87.

2. The Guaranty

The parties disputed whether the guaranty was two pages or included a third page. Under the two-page guaranty, Kassab guaranteed the rent of the Cinema for 25 years from the time the lease was entered into. Under the purported third page of the guaranty, Kassab's guarantee of the Cinema rent would be limited to 10 years from the time the lease was entered into.

The guaranty also provided for the recoupment of attorney fees and costs in the event of a dispute. The relevant provisions of the guaranty for the fees and costs dispute are:

> Guarantor hereby waives presentment, protest, notice of default, demand for payment, and all other suretyship defenses whatsoever with respect to any payment guaranteed under this Guaranty, and agrees to pay unconditionally upon demand all amounts owed under the Lease. Guarantor further waives any setoff, defense or counterclaim that Tenant or Guarantor may have or claim to have against Landlord and the benefit of any statute of limitations affecting Guarantor's liability under this Guaranty.
> . . . .
> If Landlord retains an attorney to enforce this Guaranty or to bring any action or any appeal in connection with this Guaranty, the Lease, or the collection of any payment under this Guaranty or the Lease, Landlord shall be entitled to recover its attorneys' fees, costs, and disbursements in connection therewith, as determined by the court before which such action or appeal is heard, in addition to any other relief to which Landlord may be entitled. Any amount owing under this

8

Guaranty shall bear interest from the date such amount was payable to Landlord to the date of repayment at a rate equal to the lesser of 18% and the maximum rate permitted by law.

CP at 3088-89.

3. The Covenants, Conditions, and Restrictions

The "Covenants, Conditions, and Restrictions for the Gardner Center" (CCRs) were signed by Kassab and notarized on June 22, 2004. CP at 4665. The CCRs were then recorded with Clark County on June 24, 2004.

The CCRs include a requirement that the "Declarant" maintain the common areas of the Gardner Center. CP at 4674. The "Declarant" is "The Gardner Center LLC, or any successor or assign who has or takes title to any portion of the Property and who is designated as a Declarant in a written instrument executed by an immediately preceding Declarant and recorded in the County Records." CP at 4666.

4. The Common Area Maintenance Agreement

The Common Area Maintenance Agreement (CAM Agreement) "provide[d] for the common operation, control, [and] maintenance of the common area portions of the Shopping Center . . . to include all driveways, drive aisles, sidewalks, parking areas, landscaping, and other amenities." CP at 4691. The CAM Agreement appointed the Walker Ownership as "the Maintenance Director, responsible for the operation, control, and maintenance, of the Common Area." CP at 4691. As "Maintenance Director," the Walker Ownership was responsible for "maintaining the Common Area in good, clean condition and fully operational at all times" and "any repairs and maintenance required in the Common Area." CP at 4691. The Walker Ownership was to remain the "Maintenance Director" for 75 years unless the CAM Agreement was

9

unanimously terminated. CP at 4692. The record does not show that the CAM Agreement was terminated.

G. SUMMARY JUDGMENT

Both parties moved for summary judgment. With regard to the breach of lease claims, the Walker Ownership argued that (1) nothing in the lease requires the landlord to undertake the requested repairs to the common area, (2) the plain terms of the lease state that the landlord is not responsible for a tenant's failure to properly dispose of trash, and (3) Section 6.5 of the lease is an indemnity clause that waives all claims for property damage by the tenant against the landlord. The superior court granted the Walker Ownership's summary judgment motion for breach of lease. And the superior court denied Kassab's competing summary judgment motion.

With regard to the guaranty claims, the superior court granted the Walker Ownership's motion for summary judgment for breach of contract and declaratory judgment. The superior court denied the Walker Ownership's motion for summary judgment for fraudulent omission, fraudulent inducement, negligent misrepresentation, and intentional misrepresentation. The superior court ordered that the Walker Ownership was "entitled to a judgment against [Kassab] declaring the Guaranty to be effective for the entire 25-year term of the Lease." CP at 7918.[3]

H. SUPERIOR COURT'S ORDER FOR ATTORNEY FEES, EXPENSES, COSTS, AND DISBURSEMENTS

As a result of its rulings, the superior court found that the Walker Ownership was the prevailing party and was, therefore, entitled to "attorney fees, expenses, costs and disbursements."

---

[3] Neither party assigns error to this ruling on appeal.

CP 7918.  The superior court cited to the terms of the Lease, the Guaranty, and applicable law as supporting the award of attorney fees.

I.     APPEAL

The Cinema and Kassab appeal.  The Cinema appeals the superior court's order granting summary judgment to the Walker Ownership in the Lease Case.  Kassab appeals the superior court's award of fees, costs, expenses and disbursements.

ANALYSIS

A.     SUMMARY JUDGMENT IN THE LEASE CASE

The Cinema argues that the superior court erred in awarding summary judgment to the Walker Ownership in the Lease Case.  Specifically, the Cinema argues that the Walker Ownership had a duty to maintain the common areas under the terms of the lease, the CAM Agreement, the CCRs, and common law.  The Cinema further argues that sufficient evidence was presented to create a question of material fact as to whether the duty was breached.  Because the Walker Ownership assumed a duty to maintain the common areas under the lease and a question of fact exists as to whether that duty was breached, we hold that the superior court erred in granting summary judgment to the Walker Ownership with respect to the Lease Case.

1.     Legal Principles

a. Summary Judgment

We review summary judgments de novo and perform the same inquiry as the superior court.  *Lakey v. Puget Sound Energy, Inc.*, 176 Wn.2d 909, 922, 296 P.3d 860 (2013).  We may affirm summary judgment on any ground supported by the record.  *Lakey*, 176 Wn.2d at 922.  The evidence, and all reasonable inferences therefrom, are viewed in the light most favorable to the

nonmoving party, which, in this case, is the Cinema. *Pac. Marine Ins. Co. v. Dep't of Revenue*, 181 Wn. App. 730, 737, 329 P.3d 101 (2014). Summary judgment is appropriate where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." CR 56(c). "'A material fact is one upon which the outcome of the litigation depends.'" *In re Estate of Black*, 153 Wn.2d 152, 160, 102 P.3d 796 (2004) (quoting *Balise v. Underwood*, 62 Wn.2d 195, 199, 381 P.2d 966 (1963)).

The party moving for summary judgment "bears the initial burden of showing the absence of an issue of material fact." *Young v. Key Pharms., Inc.*, 112 Wn.2d 216, 225, 770 P.2d 182 (1989), *overruled on other grounds by* 130 Wn.2d 160 (1996). A defendant moving for summary judgment, as the Walker Ownership did in this case, may show the absence of an issue of material fact by pointing out the lack of evidence supporting an essential element of the plaintiff's case. *Id.* at 225 n.1, (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)). If the defendant successfully shows the lack of any support for an essential element of the plaintiff's claim, the plaintiff must produce evidence that raises a genuine issue of material fact or show why further discovery is warranted; the plaintiff's failure to do so entitles the defendant to judgment as a matter of law. *Id.* at 225-26, 226 n.2.

b. Contract Interpretation

The interpretation of a contract can be a mixed question of law and fact. *Mut. of Enumclaw Ins. Co. v. USF Ins. Co.*, 164 Wn.2d 411, 424 n. 9, 191 P.3d 866 (2008). When the contract is not ambiguous and extrinsic evidence is not required to make sense of the contract terms, contract interpretation is a question of law. *Id.* Ambiguity exists if the contract's language is susceptible to more than one reasonable interpretation. *Holden v. Farmers Ins. Co. of Wash.*, 169 Wn.2d 750,

756, 239 P.3d 344 (2010). When extrinsic evidence is relied upon, the interpretation becomes a question of fact. *Viking Bank v. Firgrove Commons 3, LLC*, 183 Wn. App. 706, 711, 334 P.3d 116 (2014).

When interpreting a contract, a court attempts to ascertain the parties' intent. *Id.* at 712. "Washington follows the 'objective manifestation theory' of contract interpretation, under which the focus is on the reasonable meaning of the contract language to determine the parties' intent." *Id.* at 712-13 (quoting *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 154 Wn.2d 493, 503, 115 P.3d 262 (2005)). "In discerning the parties' intent, subsequent conduct of the contracting parties may be of aid, and the reasonableness of the parties' respective interpretations may also be a factor in interpreting a written contract." *Berg v. Hudesman*, 115 Wn.2d 657, 668, 801 P.2d 222 (1990). Words used in contracts are generally given their ordinary meaning, unless a contrary meaning is clearly demonstrated. *Viking Bank*, 183 Wn. App. at 713.

2.      Existence of a Duty

The Cinema argues that the superior court erred in granting the Walker Ownership's summary judgment motion in the Lease Case. The Cinema identifies section 1.1 of the lease as incorporating the CCRs and argues that the CCRs require the Walker Ownership to maintain the common areas. The Cinema also identifies section 3.2(1) of the lease and argues that the only reasonable construction of that section is to impose the duty to maintain the common areas on the Walker Ownership. The Cinema also argues that the CAM Agreement supports its position that the Walker Ownership had a duty to maintain the common areas. Although not arguing common law as the source of the Walker Ownership's duty, the Cinema relies on the common law duty to maintain to argue that the parties intended the Walker Ownership to have the duty to maintain the

common areas. We hold that the language of section 3.2(1) of the lease, along with the extrinsic evidence in the CAM Agreement, show that parties intended for the Walker Ownership to have the duty to maintain the common areas.

a. Section 1.1 and the CCRs

The Cinema argues that section 1.1 of the lease incorporates the CCRs into the lease and that the CCRs evidence a duty on the part of the Walker Ownership to maintain the common areas. We disagree and hold that while the CCRs were part of the lease between the Cinema and the Walker Ownership, the record does not support that the covenants made in the CCRs are covenants that must be fulfilled by the Walker Ownership.

The CCRs clearly were part of the lease between the Cinema and the Walker Ownership. First, the CCRs were recorded and section 1.1 of the lease subjects the lease to all "easements, restrictions, [and] agreements of record." CP at 3056. Second, the CCRs were recorded before the Gardner Center was transferred to the Walker Ownership, making the transferred property subject to the recorded covenants. *Thorstad v. Federal Way Water and Sewer Dist.*, 73 Wn. App. 638, 643, 870 P.2d 1046 (1994) (Because the covenants were properly recorded before the property was quitclaimed, the deeded property was subject to the recorded covenants.). Finally, the CCRs provide that the Gardner Center "and all parts thereof shall be . . . conveyed subject to the terms of this Declaration" and are binding upon anyone who has or acquires "any right, title, or interest in or to" the Gardner Center. CP at 4665.

However, while the CCRs are part of the lease, the record does not support that the Walker Ownership is bound by the maintenance and repair covenant in the CCRs. The "Maintenance and Repair of the Common Area Facilities" section in the CCRs imposes a duty on the part of the

"Declarant" to maintain the common area facilities. CP at 4674. The "Declarant" is "The Gardner Center LLC, *or any successor or assign who has or takes title to any portion of the Property and who is designated as a Declarant in a written instrument executed by an immediately preceding Declarant and recorded in the County Records*." CP at 4666 (emphasis added).

Here, the Walker Ownership was a "successor or assign" who took title to the Gardner Center. CP at 4666. The Walker Ownership was not "designated as a Declarant in a written instrument executed by an immediately preceding Declarant and recorded in the County Records." CP at 4666. Therefore, we hold that the CCRs do not evidence a duty by the Walker Ownership to maintain the common areas.

### b. Section 3.2(1) and the CAM Agreement

The Cinema next argues that the only reasonable construction of section 3.2(1) of the lease imposes the duty to maintain the common areas on the Walker Ownership. The Cinema cites the CAM Agreement and common law as further support for this interpretation. We hold that section 3.2(1) of the lease does not expressly state that the Walker Ownership is charged with the duty to maintain the common areas. Nonetheless, the Walker Ownership had a duty under the lease to maintain the common areas because the result of section 3.2(1) does not make sense if another assumes the duty and because the CAM Agreement is extrinsic evidence of the Walker Ownership's intent to maintain the common areas.

Section 3.2(1) of the lease states that the Cinema is responsible for its proportional share of the costs associated with the maintenance of the common areas and for paying a "management fee." CP at 3058. The language of section 3.2(1) does not expressly state who is charged with maintaining the common areas, but the effect of section 3.2(1) is nonsensical when read to assume

15

that some entity other than the "Retail Center," and the Walker Ownership as its owners, assumes the duty to maintain the common areas.

First, the language in section 3.2(1) stating that the "Tenant shall pay as additional rent its share of all operating expenses for the Retail Center," shows that the "operating expenses" are expenses incurred by the "Retail Center" and that the Cinema is responsible for reimbursing "its share" of those expenses to the "Retail Center." CP at 3058. Second, the "operating expenses" that are incurred by the "Retail Center" are "all costs of administration, operation, management, maintenance, repair and replacement of the common areas of the Retail Center." CP at 3058. Those costs include "maintenance and repair of the Retail Center . . . costs of repairs, replacements and general maintenance; . . . and a management fee of four percent (4%) of the gross rentals of the Retail Center." CP at 3058. If the "Retail Center," and the Walker Ownership as the owner of the "Retail Center," did not have a duty to maintain the common areas, then the effect of section 3.2(1) would allow the "Retail Center" to collect expenses for maintenance and repair work despite not having conducted or directed any of the maintenance or repair work.[4]

---

[4] To illustrate the absurdity that results from reading section 3.2(1) as not imposing a duty to maintain the "Retail Center," consider this hypothetical: a part of the common area needs fixing; the tenant endeavors to fix the problem; and the fix costs the tenant $100. Under the language of 3.2(1), that $100 is part of the "operating expenses" because it is a "cost[] of . . . maintenance, repair and replacement of the common areas." CP at 3058. However, the tenant would have to pay "its share" of $100 to the Retail Center as "additional rent," because that $100 was an "operating expense," despite the tenant having already paid $100 for the repair. This would be an absurd result because, under the Walker Ownership's position that it had no duty to maintain, the Retail Center would have no duty to reimburse the tenant for amounts the tenant paid for repairs, and the Retail Center would collect a windfall of "additional rent" for "operating expenses" that were not expenses of the Retail Center.

Although it seems unlikely that it was the parties' intent to allow the "Retail Center" to collect "additional rent" for maintenance and repair work it did not perform, the absence of express language creating or waiving such a duty under the lease renders the existence of the duty ambiguous. To interpret written contract language that is ambiguous, we use the "context rule." *Berg*, 115 Wn.2d at 667 (quoting *Eagle Ins. Co. v Albright*, 3 Wn. App. 256, 267, 474 P.2d 920 (1970)). Under the "context rule," subsequent conduct of the contracting parties and the reasonableness of the parties' interpretations can be considered. *Id.* at 668.

Here, the CAM Agreement, as subsequent conduct of the parties, is instructive. The CAM Agreement appointed the Walker Ownership as the "Maintenance Director" for the Gardner Center. In that capacity, the Walker Ownership was responsible for maintaining the common areas in "good, clean condition," and to make "any repairs and maintenance required" to the common areas to keep "asphalt surfaces" level; remove "papers, debris, filth and refuse"; maintain "all landscaped areas"; maintain and repair "any and all perimeter walks, common storm drains, exterior common utility lines, common sewer and other services which are necessary for the operation of all buildings" in the Gardner Center; maintain "any off-site facilities to facilitate proper surface drainage around the Common Area"; and "[o]btain any necessary environmental investigations." CP at 4691-92.

These duties are the same duties that the Walker Ownership argued on summary judgment, and now on appeal, that it did not have under the lease. But the Walker Ownership's assumption of the duty to maintain the common areas under the CAM Agreement is extrinsic evidence that the Walker Ownership intended to assume the duty to maintain the common areas in the lease. When this extrinsic evidence is combined with the absurd result that a contrary interpretation of the lease

17

language leads to, we hold that the lease must be interpreted as placing the duty to maintain the common areas on the Walker Ownership.

### c. Section 6.5 and Paragraph 13 do not waive the duty

The Walker Ownership argues that any duty that it otherwise would have to maintain the common areas was waived by the terms in the lease. On summary judgment, the Walker Ownership identified section 6.5 of the lease as waiving the duty, and on appeal, the Walker Ownership identifies paragraph 13 of "Exhibit E" to the lease. We hold that neither provision of the lease waives the Walker Ownership's duty to maintain the common areas.

### i. Section 6.5 of the lease

The effect of section 6.5 of the lease is to indemnify and waive claims against the Walker Ownership in the event a person or person's property is harmed while using the Gardner Center. That is not the type of claim made by the Cinema in this case.

Here, the Cinema is suing the Walker Ownership for not abiding by the terms of the lease. Accordingly, the Cinema's indemnification and waiver of claims against the Walker Ownership for harms suffered by people at the Gardner Center is not applicable. Therefore, section 6.5 of the lease does waive the Cinema's breach of lease claim.

### ii. Paragraph 13 of Exhibit E to the lease

In pertinent part, paragraph 13 requires that the "[t]enant shall keep the outside areas immediately adjoining the Premises clean and free from . . . dirt and rubbish." CP at 3087. Nothing in the language of paragraph 13 waives the Walker Ownership's duty to maintain the common

areas.[5]   Therefore, paragraph 13 of Exhibit E does not waive the Walker Ownership's duty to maintain the common areas.

        3.      Existence of a Breach

The Cinema argues that there is a question of fact as to whether the Walker Ownership breached its duty to maintain the common areas.  We agree.

The Cinema presented evidence of several problems with the garbage facilities and pests that had been drawn to the area as a result.  Included in the evidence were pictures of the problems and a series of e-mails spanning from mid-July 2012 to late October 2013 noting that the problem had not been resolved.  The Cinema also presented evidence of an inspection that was performed by "National Property Inspections," in August of 2012. CP at 4176.  The inspection noted several cracked and broken curbs, cracks in the parking lot and on sidewalks, and an "undermined" sidewalk that was "causing a tripping hazard" by the parking lot around the Cinema, and recommended their repair.  CP at 4198.  The inspection also noted that the fountain near the Cinema showed evidence of having overflowed to the south-side exit of the Cinema and that the mortar joints in the pond wall were cracked, and recommended repair.  The Cinema presented evidence of e-mail correspondence with the "Property Manager" showing that the sidewalk had not been replaced by late January 2013.  CP at 4224.  While there may be reasons for the delay, on the evidence presented, we hold that whether the Walker Ownership "promptly cured within a

---

[5] In the event that the area that the Cinema has a duty to keep free from dirt and rubbish, overlap the common areas that the Walker Ownership had a duty to maintain, the dispute would be over who breached their respective duty.

reasonable time," as the Walker Ownership contends, remains an issue of fact. Br. of Resp't at 32.

4.    Conclusion

We hold that Walker Ownership had a duty to maintain the common areas under the lease and whether that duty was breached is an issue of fact. Accordingly, we hold that the superior court erred in granting summary judgment to the Walker Ownership with respect to the Lease Case.

B.    ATTORNEY FEES AWARD BY THE SUPERIOR COURT

Both parties argue that if we reverse the summary judgment order in the Lease Case, we should reverse only the award for attorney fees and costs that were attributed to the Lease Case in the superior court's order.

Where the superior court "finds the claims to be so related that no reasonable segregation of successful and unsuccessful claims can be made, there need be no segregation of attorney fees." *Hume v. Am. Disposal Co.*, 124 Wn.2d 656, 673, 880 P.2d 988 (1994). Here, the superior court found and concluded that the two cases were "interrelated and involve[d] a common core of facts" such that "all work performed was expended in pursuit of the ultimate result achieved." Suppl. CP at 9576-77. As such, the award cannot necessarily be divided between the cases according to the summary included in the superior court's order.

Therefore, we vacate the award of attorney fees and costs and remand for the superior court to determine the award of reasonable attorney fees and costs after the entirety of the litigation in the consolidated case is concluded. *See, e.g.*, *Mayer v. City of Seattle*, 102 Wn. App. 66, 74-75, 79-83, 10 P.3d 408 (2000) (reversing summary judgment and remanding for reconsideration of

attorney fees award). On remand, we instruct the superior court to consider the amount of attorney fees and costs requested with a critical eye and independent judgment to ensure it properly applies the lodestar method.[6]

C.      IN-CAMERA REVIEW ON REMAND

Kassab argues that on remand the ruling by the discovery master authorizing an in-camera review under the crime-fraud exception is moot because the claims based on the third page of the guaranty are resolved. The Walker Ownership responds that Kassab did not assign error to the discovery master's ruling and that if this court remands on the Lease Case, an in-camera review "could reveal that those claims were knowingly tainted by fraudulent conduct." Br. of Resp't at 66. Because the discovery master's ruling was issued for the purpose of resolving the authenticity of the third page of the guaranty, we hold that the ruling is no longer in effect because the issue of the third page of the guaranty has been concluded.

D.      ATTORNEY FEES ON APPEAL

Both parties request attorney fees on appeal. We decline to award attorney fees on appeal because there is not yet a final judgment. RCW 4.84.330.

CONCLUSION

We reverse the superior court's order granting summary judgment to the Walker Ownership. We also reverse the award of attorney fees and costs to the Walker Ownership. This decision does not affect the prevailing party from seeking a determination of reasonable fees and

---

[6] Because we reverse the award of attorney fees and costs, Kassab's assignments of error regarding the award of fees and costs need not be addressed.

No. 47718-1-II

costs at the conclusion of the case in superior court. Further, the discovery master's order is moot because it was issued for the purpose of discovering information that is no longer relevant.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Lee, J.

We concur:

Worswick, J.

Bjorgen, C.J.

22